1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

SOPHIA SALAJAN,                    )    Case No. EDCV 07-1065 JC
                                   )
                    Plaintiff,     )
                                   )    MEMORANDUM OPINION
            v.                     )
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social             )
Security,                          )
                                   )
                    Defendant.     )
_____  )

18
19
20
21
22
23
24
25
26
27
28

I.    **SUMMARY**

        On August 22, 2007,  plaintiff Sophia Salajan ("plaintiff") filed a Complaint

seeking review of the Commissioner of Social Security's denial of plaintiff's

application for benefits.  The parties have filed a consent to proceed before a

United States Magistrate Judge.

        This matter is before the Court on the parties' cross motions for summary

judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion").  The

Court has taken both motions under submission without oral argument.  See Fed.

R. Civ. P. 78; L.R. 7-15; August 27, 2007 Case Management Order, ¶ 5.

///

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED.  The findings of the Administrative Law Judge ("ALJ") are supported by substantial evidence and are free from material error.[1]

## II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On October 14, 2005, plaintiff filed an application for Supplemental Security Income benefits.  (Administrative Record ("AR") 13).  Plaintiff asserted that she became disabled on November 8, 2000, due to pain and headaches.  (AR 62).  The ALJ examined the medical record and heard testimony from plaintiff (who was represented by counsel) and a vocational expert on April 24, 2007.  (AR 208-32).

On May 3, 2007, the ALJ determined that plaintiff was not disabled through the date of the decision.  (AR 13-17).  Specifically, the ALJ found:  (1) plaintiff suffered from the following severe impairments:  myofascial strain of the cervical and lumbar spine, and posttraumatic cephalgia (AR 15); (2) plaintiff's impairments, considered singly or in combination, did not meet or medically equal one of the listed impairments (AR 15); (3) plaintiff could perform light work and could occasionally bend, stoop, lift, push, pull and climb (AR 15); and (4) plaintiff could perform her past relevant work as a file clerk (AR 17).

The Appeals Council denied plaintiff's application for review.  (AR 4).

///

///

///

---

[1]The harmless error rule applies to the review of administrative decisions regarding disability.  See Batson v. Commissioner of Social Security Administration , 359 F.3d 1190, 1196 (9th Cir. 2004) (applying harmless error standard); see also Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1054-56 (9th Cir. 2006) (discussing contours of application of harmless error standard in social security cases).

## III.   APPLICABLE LEGAL STANDARDS

### A.   Sequential Evaluation Process

To qualify for disability benefits, a claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

In assessing whether a claimant is disabled, an ALJ is to follow a five-step sequential evaluation process:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

(2)   Is the claimant's alleged impairment sufficiently severe to limit her ability to work? If not, the claimant is not disabled. If so, proceed to step three.

(3)   Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is disabled. If not, proceed to step four.

///
///
///
///
///
///

3

1      (4)     Does the claimant possess the residual functional capacity to

2             perform her past relevant work?[2]  If so, the claimant is not

3             disabled.  If not, proceed to step five.

4      (5)     Does the claimant's residual functional capacity, when

5             considered with the claimant's age, education, and work

6             experience, allow her to adjust to other work that exists in

7             significant numbers in the national economy?  If so, the

8             claimant is not disabled.  If not, the claimant is disabled.

9 Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th

10 Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

11      The claimant has the burden of proof at steps one through four, and the

12 Commissioner has the burden of proof at step five.  Bustamante v. Massanari, 262

13 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679

14 (claimant carries initial burden of proving disability).

15    **B.**    **Standard of Review**

16      Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of

17 benefits only if it is not supported by substantial evidence or if it is based on legal

18 error.  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir.

19 2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457

20 (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable

21 mind might accept as adequate to support a conclusion."  Richardson v. Perales,

22 402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a

23 ///

24

25        [2]ALJs routinely rely on the Dictionary of Occupational Titles ("DOT") "in determining

26 the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy."  Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir.

27 1990) (citations omitted); see also 20 C.F.R. § 416.966(d)(1) (DOT is source of reliable job information).  The DOT is the presumptive authority on job classifications.  Johnson v. Shalala,

28 60 F.3d 1428, 1435 (9th Cir. 1995).

1    mere scintilla but less than a preponderance. <u>Robbins</u>, 466 F.3d at 882 (citing

2    <u>Young v. Sullivan</u>, 911 F.2d 180, 183 (9th Cir. 1990)).

3          To determine whether substantial evidence supports a finding, a court must

4    "'consider the record as a whole, weighing both evidence that supports and

5    evidence that detracts from the [Commissioner's] conclusion.'" <u>Aukland v.</u>

6    <u>Massanari</u>, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting <u>Penny v. Sullivan</u>, 2 F.3d

7    953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming

8    or reversing the ALJ's conclusion, a court may not substitute its judgment for that

9    of the ALJ. <u>Robbins</u>, 466 F.3d at 882 (citing <u>Flaten</u>, 44 F.3d at 1457).

10   **IV.   DISCUSSION**

11        **A.     The ALJ Did Not Commit Reversible Error in Evaluating the**

12               **Medical Evidence**

13        Plaintiff alleges that the ALJ failed properly to consider treating physician

14   opinions reflected on a Medical Opinion Re: Ability to Do Work Related

15   Activities form and erroneously rejected such opinions without providing specific

16   and legitimate reasons therefor which are supported by substantial evidence in the

17   record. (Plaintiff's Motion at 2-5) (citing AR 17, 175-77). Plaintiff also contends

18   that the ALJ rejected such opinions based in part on an ambiguity in the record

19   which triggered the ALJ's obligation to develop and clarify the record. (Plaintiff's

20   Motion at 4). Defendant contends that the ALJ's rejection of such opinions and

21   his conclusion regarding plaintiff's residual functional capacity is supported by

22   substantial evidence, and adequate findings, and that further development of the

23   record is unnecessary.[3] (Defendant's Motion at 3-8).

24   _____

25        [3]Defendant also argues that there is no evidence that the person who offered the opinions
     reflected on the form is a physician, let alone a treating physician. (Defendant's Motion at 4).
26   Defendant further suggests that the form may have been completed by a chiropractor who is not
     an acceptable source of medical evidence. (Defendant's Motion at 4). However, the ALJ did not
27   question that the forms were completed by an "unknown physician" whom he referred to as a

28                                                                    (continued...)

5

1          **1.**    **Pertinent Facts**

2             **a.**    **Medical Records/Opinions**

3       Plaintiff alleges that she became disabled on November 8, 2000 when a

4  heavy box fell on her at work, causing her to fall and lose consciousness.  (AR

5  143).  She was thereafter examined and treated by multiple physicians.

6       In November 2000, James Mitchner, M.D., diagnosed plaintiff with

7  contusion of the face, scalp, and neck, with a mild left knee contusion.  (AR 137).

8  He provided a lumbar support and medication, and directed her to commence

9  physical therapy.  (AR 137).  A few days later, plaintiff presented with complaints

10  of pain in her neck, chest wall, and lower back.  (AR 137).  She was advised to

11  continue with physical therapy and medication.  (AR 138).

12      In December 2000, Neal S. Archer, D.O., saw plaintiff on three occasions.

13  (AR 138).  She presented with persistent pain in her head and neck.  Dr. Archer

14  diagnosed her with cervical strain, referred her to a chiropractor, and directed her

15  to continue physical therapy.  (AR 138).

16      Between December 2000 and at least March 2004, plaintiff saw her primary

17  treating physician Edward G. Stokes, M.D., an orthopaedic surgeon/qualified

18  medical examiner.  (AR 75-157).  Dr. Stokes examined plaintiff over 25 times

19  during such time frame, evaluated various tests (e.g., x-rays, MRIs), and referred

20  her to other consulting physicians whose reports and tests he reviewed.[4]  (AR 75-

21

22

23      [3](...continued)
    "general practitioner."  (AR 17).  The Administration's decision must stand or fall with the

24  ALJ's reasoning.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (district court
    cannot affirm on the basis of evidence the ALJ failed to discuss); Pinto v. Massanari, 249 F.3d

25  840, 847 (9th Cir. 2001) (court "cannot affirm the decision of an agency on a ground that the
    agency did not invoke in making its decision").

26

27      [4]On June 27, 2001 an MRI of plaintiff's lumbar spine reflected:  (1) evidence of a 2 mm.
    posterior disc protrusion at the L4-5 level with the presence of disc dessication, bilateral

28                                     (continued...)

157).  He treated or caused plaintiff to be treated with physical therapy,
acupuncture, and chiropractic treatments, and prescribed a Tens unit and Swiss
ball for home use.  (AR 75-157).  In August 2002, Dr. Stokes prepared a lengthy
report summarizing plaintiff's condition and treatment course, and reflecting his
diagnoses, and the basis therefor.  (AR 97-108).  He diagnosed plaintiff with
myofascial strain of the cervical spine with small disc bulges and myofascial strain
of the lumbar spine with a 2 mm. disc bulge at L4-5 and a 2-3 mm. disc bulge at
L5-S1 region.  (AR 104).  Dr. Stokes also offered opinions regarding plaintiff's
work restrictions:  (1) plaintiff is precluded from repetitive motions of the neck,
having lost 50% of her pre-injury capacity for flexing, extending, bending and
rotating her neck; and (2) plaintiff is precluded from heavy work, having lost 50%
of her pre-injury capacity for performing such activities as bending, stooping,
lifting, pushing, pulling, climbing, and other activities involving comparable
physical effort.  (AR 106).

On at least four occasions between February 2001 and April 2001, Dr.
Amini, a neurologist, examined and evaluated plaintiff relating to her headache
complaints.  (AR 103-04).  Dr. Amini diagnosed plaintiff with post-traumatic
headaches and prescribed medication.  (AR 103).  He also referred her for an MRI
of the brain, which was normal, and performed other tests (e.g., an
electroencephalogram) which were normal.  (AR 103-04).  On April 17, 2001, Dr.

---

[4](...continued)
hypertrophic facet changes and lateral recess stenosis; and (2) a 2 to 3 mm. disc protrusion at the
L5-S1 level, with the presence of disc dessication, bilateral hypertrophic facet changes, and mild
neural foramina narrowing.  (AR 102, 181-82).

On February 15, 2002 an MRI of plaintiff's cervical spine reflected:  (1) evidence of a 2
mm. central disc protrusions at the C5-6 level with the presence of hypertrophic changes
anteriorly and posteriorly and the patent presence of neural foramina; (2) a 2 to 3 mm. right
posterolateral disc protrusion at the C6-7 level with narrowing in the AP and tight lateral recess
diameter – the possibility of subligamentous disc herniation could not be excluded; and (3) the
relative straightening of the cervical spine.  (AR 103, 179-80).

Amini diagnosed plaintiff with posttraumatic head syndrome and probable cervicogenic cephalgia, and recommended that she continue taking medications. (AR 104).

On June 30, 2004, Robert A. Dickman, DC, reviewed plaintiff's medical file and recommended no further treatment.  (AR 183-85).

On November 22, 2005, J. Pierce Conaty, M.D., a consulting orthopaedic surgeon, performed a physical examination of plaintiff.  (AR 158-62).  Dr. Conaty diagnosed plaintiff with lumbosacral strain, resolved clinically but with subjective complaints of neck and low back pain.  (AR 161).  He opined that plaintiff has some impairment restrictions, noting that she could:  (1) lift 50 pounds occasionally, and 25 pounds frequently; (2) stand and walk for six hours in an eight-hour work day; and (3) sit for six hours in an height-hour work day.  (AR 161).

The record contains two completed forms dated August 15, 2006, entitled "Medical Opinion Re: Ability to Do Work-Related Activities." dated August 15, 2006 (respectively the "first form opinion" and the "second form opinion"; collectively the "form opinions").  (AR 172-77).  The form opinions are in different handwriting and bear different signatures.  (AR 172-77).  Neither signature is legible.  (AR 174, 177).  The authors of the form opinions cannot otherwise be discerned from such documents.  Nor does the record otherwise definitively reflect the identity of the authors.  Both forms were part of "Exhibit 4F" in the administrative proceedings.

### (i)     The First Form Opinion

The author of the first form opinion checked boxes indicating that plaintiff: (i) could carry less than ten pounds both occasionally and frequently; (ii) could stand and walk less than two hours and sit for two hours in an eight-hour day; (iii) could sit for 30 minutes and stand for 15 minutes before changing positions; (iv) must walk every 60 minutes for 15 minutes; (v) must be able to shift at will

8

1   from sitting to standing or walking; and (v) must lie down at unpredictable

2   intervals, probably every two hours.  (AR 172-73).  He/she opined that medical

3   findings of "severe back pain, neck pain, [and] shoulder pain" supported these

4   limitations.  (AR 173).

5        Said author also checked boxes indicating that plaintiff could occasionally

6   twist, stoop (bend), crouch, climb stairs, and climb ladders but did not complete

7   the portion of the form which called for medical findings in support of this

8   conclusion.  (AR 173).  The author also checked boxes indicating that plaintiff's

9   ability to reach (including overhead) and push and pull were affected by her

10  impairments and wrote that these functions were affected by plaintiff's pain in her

11  neck and shoulders.  (AR 174).  He/she indicated that diffuse tenderness was the

12  medical finding in support of this conclusion.  (AR 174).

13       The author also checked boxes indicating that plaintiff should avoid even

14  moderate exposure to extreme cold, extreme heat, wetness, humidity and hazards

15  (machinery, heights, etc.), but did not describe how plaintiff's activities were

16  limited by these environmental factors, further identify the hazards to be avoided

17  or explain the medical findings that supported these limitations.  (AR 174).

18  Finally, the author indicated that plaintiff did not require assistive devices, and

19  that her impairments would cause her to be absent from work about twice a month.

20  (AR 174).

21  **(ii)   The Second Form Opinion**

22       The author of the second form opinion checked boxes or otherwise

23  indicated that plaintiff:  (i) could carry ten pounds occasionally and less than ten

24  pounds frequently; (ii) could stand and walk for two hours and sit for four hours in

25  an eight-hour day; (iii) could sit for ten minutes and stand for ten minutes before

26  changing positions; (iv) must walk every ten minutes for five minutes; (v) must be

27  able to shift at will from sitting to standing or walking; (vi) must lie down at

28  unpredictable intervals; (vii) could occasionally twist, stoop (bend), and climb

stairs; (viii) could never crouch or climb ladders; and (ix) should avoid all exposure to extreme cold and heat, even moderate exposure to wetness, humidity and hazards, and concentrated exposure to noise and fumes. (AR 175-77). He/she also checked a box and hand wrote a notation indicating that plaintiff's ability to reach, including overhead, was sometimes affected by her impairments. (AR 177).

The author did not complete the portions of the form which called for medical findings in support of any of the foregoing limitations. (AR 175-77). The author also checked a box indicating that plaintiff's impairments would cause her to be absent from work more than three times a month. (AR 177). Finally, the author wrote that "at this time [plaintiff] is precluded from prolonged standing, walking, bending, stooping, work over the shoulders, and repetitive work [with] bilateral hands, wrists." (AR 177).

### b.    Pertinent ALJ Findings

The ALJ's residual functional capacity assessment does not correspond to any one physician's medical opinion. It incorporates more restrictions/limitations than suggested by Dr. Conaty in 2005, arguably less restrictions/limitations than suggested by Dr. Stokes in 2002, and definitely less restrictions/limitations than suggested by the "unknown physician(s)" who completed the form opinions in 2006.

The ALJ found plaintiff to have the residual functional capacity to perform at least light work, and that she could occasionally bend, stoop, lift, push, pull and climb. (AR 15).[5]

---

[5]Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, one must have the ability to do substantially all of these activities. If someone can do light work, she can also do sedentary

(continued...)

The ALJ rejected the forms opinions, stating:

> The Medical Opinion Re: Ability to Do Work Related Activities
> dated August 15, 2006, by an unknown physician shows a sedentary
> residual functional capacity.  The conclusionary forms are not
> supported by or accompanied by any objective evidence.  A
> conclusion regarding the ability to work is partially a vocational
> judgment which is clearly beyond the expertise of the general
> practitioner completing the forms.  Additionally, the forms provide no
> specific limitations on the claimant's ability to perform work activity.
> There is no indication that the claimant was seen by this physician at
> any other time than for this evaluation.

(AR 17).

Although the ALJ refers to "forms" in the plural, he appears to assume that
both form opinions were completed by a single physician – a general practitioner.

## 2.   Analysis

Plaintiff contends that the ALJ (i) erroneously found that the physician who
authored the form opinions did not have sufficient expertise to render an opinion
regarding plaintiff's ability to work; (ii) incorrectly suggested that the form
opinions provided no specific limitations on plaintiff's ability to work when in fact
virtually the entirety of the form opinions provide such specific limitations; and
(iii) improperly rejected the form opinions based upon the ambiguous lack of

---

[5](...continued)
work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit
for long periods of time.  See 20 C.F.R. § 416.967(b).

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined
as one which involves sitting, a certain amount of walking and standing is often necessary in
carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and
other sedentary criteria are met.  See 20 C.F.R. § 416.967(a).

1  indication in the record as to whether plaintiff previously had been seen by the

2  authoring physician.  As noted above, defendant contends that the ALJ's rejection

3  of the form opinions and his conclusion regarding plaintiff's residual functional

4  capacity is supported by substantial evidence.  Although the Court finds that the

5  ALJ erred in multiple respects relative to the form opinions, the Court finds such

6  errors to be harmless.

7         The Court recognizes that the ALJ's rejection of the form opinions is based

8  in part on an incorrect reading of the record and on incorrect assumptions which

9  are not currently borne out by the record.

10        First, although the ALJ states that the form opinions provide no specific

11  limitations on plaintiff's ability to work, the form opinions, as summarized above,

12  extensively set forth such specific limitations.

13        Second, although the ALJ expressly stated that he did not know which

14  physician authored the form opinions, he nonetheless rejected the opinions in part

15  based on unsupported assumptions regarding the expertise of the physician and the

16  infrequency of such physician's interactions with the plaintiff.  Specifically, the

17  ALJ indicating that the unknown physician lacked expertise to render a vocational

18  judgment because he/she was a general practitioner – a fact which cannot be

19  inferred from the record.[6]  The ALJ also noted that there is no indication in the

20  record that the plaintiff was seen by the authoring physician at any other time than

21  for this evaluation, apparently inferring that plaintiff saw such physician only

22  once.[7]  While the ALJ's statement is itself accurate, it does not support the

23  inference which the ALJ appears to have drawn.  Rather, as plaintiff suggests, it

24

25        [6]The ALJ did not state that he was rejecting the form opinions because he viewed

26  "vocational judgments" to be solely within his own purview.

27        [7]An ALJ may consider the length of a physician's treatment relationship with a claimant
   in determining how much weight to give the physician's opinion.  20 C.F.R. § 416.927(d)(2)(i)

28  (generally more weight given to opinion of source with lengthier treatment relationship).

1    illuminates the ALJ's failure to develop the record regarding the identity of the

2    authoring physician – an inquiry which may have  confirmed the ALJ's belief, or

3    may have yielded evidence that such physician was a treating physician, such as

4    Dr. Stokes, who had seen plaintiff on multiple occasions over an extended period

5    of time and whose opinion was entitled to great weight.[8]

6         In light of the ALJ's foregoing errors, this Court assumes, for purposes of

7    harmless error analysis that the author of the form opinions was in fact a treating

8    physician whose opinion generally may not be rejected absent clear and

9    convincing reasons, and may not be rejected in favor of a conflicting opinion of

10   another examining physician absent specific and legitimate reasons based on

11   substantial evidence in the record.  See Connett v. Barnhart, 340 F.3d 871, 874

12   (9th Cir. 2003) (where treating physician's opinion not contradicted by another

13   doctor, it may be rejected only for clear and convincing reasons; ALJ can reject

14   opinion of treating physician in favor of conflicting opinion of another examining

15   physician if ALJ makes findings setting forth specific, legitimate reasons for doing

16   so based on substantial evidence in  record) (citation and internal quotations

17   omitted). The ALJ's first articulated reason for rejecting the form opinions is that

18   they were conclusionary and were not supported or accompanied by any objective

19   evidence.  This is a clear and convincing reason which is supported by substantial

20   evidence.  See Batson v. Commissioner of Social Security Administration, 359

21   F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions

22

23   _____

24        [8]The ALJ in a social security case has an independent duty fully and fairly to develop the
     record.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted).  This
     duty extends to the represented as well as to the unrepresented claimant.  Id.  "Ambiguous

25   evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of
     the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'"  Id. (citation omitted).

26   "The ALJ may discharge this duty in several ways, including:  subpoenaing the claimant's
     physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping

27   the record open after the hearing to allow supplementation of the record."  Id. (citations omitted).

28

13

1  that are conclusory, brief, and unsupported by record as a whole or by objective

2  medical findings); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)

3  (ALJ need not accept treating physician's opinion if it is conclusory and brief and

4  unsupported by clinical findings); Burkhart v. Bowen, 856 F.2d 1335, 1339-40

5  (9th Cir. 1988) (ALJ properly rejected treating physicians' opinion which was

6  unsupported by medical findings, personal observations or test reports); Crane v.

7  Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly could reject three

8  evaluations because they were check-off reports that did not contain any

9  explanation of the bases of their conclusions) (citation omitted).  The only medical

10  findings articulated in support of the first form opinion are that plaintiff has

11  "severe back pain, neck pain, [and] shoulder pain" and "diffuse tenderness."  (AR

12  173-74).  Such "findings" do not constitute "objective evidence."  No medical

13  findings are articulated in support of the second form opinion.  Accordingly, even

14  assuming that the form opinions were authored by treating physicians, any error by

15  the ALJ in failing to develop the record regarding or in rejecting such opinions

16  was harmless.

17  **B.     The ALJ Did Not Commit Reversible Error in Concluding that**

18  **Plaintiff Was Capable of Performing Her Past Relevant Work**

19  Plaintiff argues that the ALJ's determination that plaintiff was capable of

20  performing her past relevant work is materially defective in two respects:  (1) the

21  ALJ failed to make findings of fact regarding the physical and mental demands of

22  her past job as required by SSR 82-62; and (2) the ALJ's finding was based, at

23  least in part, on the incorrect assertion that plaintiff stated that she could perform

24  this work.  (Plaintiff's Motion at 5-9).  As to plaintiff's first contention, defendant

25  asserts that the ALJ properly relied on the vocational expert's testimony and that

26  no more was required.  (Defendant's Motion at 9).  Defendant further asserts that

27  the ALJ's statement regarding plaintiff's admission constitutes a reasonable

28  inference from the evidence in the record.

1

### 1.   Pertinent Law

The Administration may deny benefits when the claimant can perform the claimant's past relevant work as "actually performed," or as "generally" performed.  Pinto v. Massanari, 249 F.3d 840, 845 (2001).  Although the claimant has the burden of proving an inability to perform her past relevant work, "the ALJ still has a duty to make the requisite factual findings to support his conclusion."  Id. at 844.  "To determine whether a claimant has the residual capacity to perform [her] past relevant work, the [Administration] must ascertain the demands of the claimant's former work and then compare the demands with [her] present capacity."  Villa v. Heckler, 797 F.2d 794, 797-98 (9th Cir. 1986).  In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain the following specific findings of fact:  (1) a finding of fact as to the individual's residual functional capacity; (2) a finding of fact as to the physical and mental demands of the past job/occupation; and (3) a finding of fact that the individual's residual functional capacity would permit a return to her past job or occupation.  SSR 82-62.

### 2.   Pertinent Facts

At the hearing in this matter, plaintiff testified to the following:  After her injury in the year 2000, she did very light paperwork in an office, maybe for a couple of months, three or four hours a day.  She arranged files and shredded paper.  She mostly sat down when she did the job, except for the little while she did shredding.  She could not do that job now because [her employer] does not have that job for her.  If she was told that such a job was available, she could do very light work – maybe arranging files or shredding paper. (AR 217, 221-28).

A vocational expert was also present and testified at the hearing.  See 20 C.F.R. § 416.960(b)(2) ("A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually

1   performed it or as generally performed in the national economy."). The vocational
2   expert stated:   The DOT described plaintiff's office work as semi-skilled. It
3   would take a four week time frame to learn the job. Plaintiff, who worked
4   essentially half time for two months at such a job did the job long enough to learn
5   how to do it. A hypothetical claimant with the work limitations assigned to
6   plaintiff by Dr. Stokes, could do the semi-skilled light job of file clerk. If,
7   however, the claimant could lift no more than ten pounds, she could not do the file
8   clerk job according to the DOT. His testimony was consistent with the DOT.
9   Although the DOT lists the file clerk position as light, there are positions as a file
10  clerk that fall in the sedentary range. (AR 224-25, 230-31).

11       As noted above, the ALJ found plaintiff to have the residual functional
12  capacity to perform at least light work, and that she could occasionally bend,
13  stoop, lift, push, pull and climb. (AR 15). He further determined that plaintiff
14  could perform her past relevant work as a file clerk, and that the work does not
15  require the performance of work-related activities precluded by her residual
16  functional capacity. (AR 17). In support of his conclusion regarding plaintiff's
17  ability to perform her past relevant work as a file clerk, the ALJ found: (1) this
18  work is semi-skilled, taking about 4 weeks to learn; (2) the claimant performed
19  this job long enough to learn it; (3) plaintiff stated that she could perform this
20  work; and (4) in comparing plaintiff's residual functional capacity with the
21  physical and mental demands of this work, plaintiff is able to perform the job as
22  actually and generally performed. (AR 17).

23          **3.    Analysis**

24       Plaintiff argues that the ALJ erred in failing to make the required findings of
25  fact as to the physical and mental demands of plaintiff's past relevant work and in
26  mischaracterizing plaintiff's testimony regarding her ability to perform her past
27  relevant work as a file clerk. While the Court agrees that the ALJ erroneously
28  failed to make the required findings regarding the physical and mental demands of

16

plaintiff's past relevant work (except to the extent he characterized it as semi-skilled), the Court concludes that such error was harmless.  The Court further finds that the ALJ's characterization of plaintiff's testimony is not materially erroneous and does not warrant remand or reversal.

First, in concluding that plaintiff could return to her past relevant work, the ALJ relied upon the testimony of the vocational expert who, as noted above, stated that, according to the DOT (i.e., as generally performed), plaintiff's job as a file clerk was semi-skilled and that a hypothetical claimant with the work limitations assigned to plaintiff by Dr. Stokes, could do such job.[9]  (AR 14, 224-25, 230-31).  A vocational expert's testimony constitutes substantial evidence upon which an ALJ may properly rely.  See Magallanes, 881 F.2d at 756-57.

Second, the vocational expert's testimony itself is supported by substantial evidence as he expressly relied upon the DOT in assessing whether the hypothetical individual in issue could perform plaintiff's past job as a file clerk.  See supra note 2.  Plaintiff does not contend that the vocational expert erred in classifying plaintiff's past relevant work according to the DOT (or the functional demands attributed to such work).  As the ALJ's findings were based on the testimony of the vocational expert which was itself consistent with the DOT – the presumptive authority on how jobs are generally performed – and as the Administration may deny benefits when the claimant can perform the claimant's past relevant work as generally performed, any error by the ALJ in failing to make adequate findings regarding the physical and mental demands of plaintiff's past relevant work is harmless.

Finally, the Court finds no material error in the ALJ's characterization of plaintiff's testimony.  As noted above, plaintiff testified that her prior job as a file clerk, as actually performed, involved arranging files and shredding paper.

_____

[9]Although the ALJ did not expressly state that he was relying on the testimony of the vocational expert, it can be reasonably inferred from the contents of the ALJ's decision, that he relied upon such testimony.

1   Plaintiff further testified that she could do very light work – maybe arranging files

2   or shredding paper.  Accordingly, the ALJ's finding that plaintiff stated that she

3   could perform this work is a reasonable inference and is not erroneous.  Even

4   assuming, however, that the ALJ mischaracterized such testimony, any such error

5   is harmless, in light of the fact that substantial evidence otherwise supports the

6   ALJ's finding that plaintiff could perform her past work as generally performed.

7        For these reasons, the Court concludes that the ALJ's failure to provide

8   specific findings of fact as to the physical and mental demands of plaintiff's past

9   relevant work and the ALJ's characterization of plaintiff's testimony do not

10  warrant reversal or remand.

11       **C.    The ALJ Did Not Commit Reversible Error in Evaluating**

12            **Plaintiff's Credibility**

13       Plaintiff contends that the ALJ materially erred by failing to discuss and to

14  provide clear and convincing reasons for rejecting specific portions of plaintiff's

15  testimony.  (Plaintiff's Motion at 9-11) (citing AR 16, 218-221).  Defendant

16  contends that the ALJ permissibly rejected plaintiff's testimony based upon the

17  inconsistency between her admission that she could perform her past relevant

18  work and her allegations of disability.  (Defendant's Motion at 10).  This Court

19  finds no material error in the ALJ's assessment of plaintiff's credibility.

20            **1.    Pertinent Law**

21       An ALJ is not required to believe every allegation of disabling pain or other

22  non-exertional impairment.  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007)

23  (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  If the record establishes

24  the existence of a medically determinable impairment that could reasonably give

25  rise to symptoms assertedly suffered by a claimant, an ALJ must make a finding as

26  to the credibility of the claimant's statements about the symptoms and their

27  functional effect.  Robbins, 466 F.3d 880 at 883 (citations omitted).  Unless an

28  ALJ makes a finding of malingering based on affirmative evidence thereof, the

1 ALJ may reject a claimant's testimony regarding the severity of her symptoms

2 only if the ALJ makes specific findings stating clear and convincing reasons for

3 doing so. Id. (citations omitted). The ALJ's credibility findings "must be

4 sufficiently specific to allow a reviewing court to conclude the ALJ rejected the

5 claimant's testimony on permissible grounds and did not arbitrarily discredit the

6 claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004). The

7 ALJ must "specifically identify the testimony [the ALJ] finds not to be credible

8 and must explain what evidence undermines the testimony." Holohan v.

9 Massanari, 246 F. 3d 1195, 1208 (9th Cir. 2001).

10       To find the claimant not credible, an ALJ must rely on (1) reasons unrelated

11 to the subjective testimony (e.g., reputation for dishonesty); (2) internal

12 contradictions in the testimony; or (3) conflicts between the claimant's testimony

13 and the claimant's conduct (e.g., engaging in daily activities inconsistent with the

14 alleged symptoms, maintaining work inconsistent with the alleged symptoms,

15 failing, without adequate explanation, to take medication, to seek treatment or to

16 follow prescribed course of treatment). Lingenfelter v. Astrue, 504 F.3d 1028,

17 1035-40 (9th Cir. 2007); Orn, 495 F.3d at 636; Robbins, 466 F.3d at 883; Burch,

18 400 F.3d at 680-81; SSR 96-7p. Although an ALJ may not disregard such

19 claimant's testimony solely because it is not substantiated affirmatively by

20 objective medical evidence, the lack of medical evidence is also a factor that the

21 ALJ can consider in his credibility assessment. Burch, 400 F.3d at 681.

22       Questions of credibility and resolutions of conflicts in the testimony are

23 functions solely of the Commissioner. Greger v. Barnhart, 464 F.3d 968, 972 (9th

24 Cir. 2006). If the ALJ's interpretation of the claimant's testimony is reasonable

25 and is supported by substantial evidence, it is not the court's role to

26 "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

27 ///

28 ///

### 2.   Pertinent Facts

During the hearing, plaintiff testified:  She does things around the house but is not working because she is in a lot of pain.  She does her own laundry and prepares her own food.  She likes to cook for herself.  Sometimes she calls a friend to help.  In Romania, she went to college to be a kindergarten teacher.  She received a Romanian Masters Degree in 1970.  She came to the United States in 1983.  She never worked as a teacher in the United States, other than volunteer teaching.  In 1994, she attended ROP College in the United States to obtain a license to teach children but never got a license.  For the last fifteen years, she has done warehouse work and custodian work.  She can read and write English but is not good at spelling.  She stopped doing the custodian warehouse work because she had hernia and gall stone surgery in 1995.  Her doctor told her that after the surgery, she could not lift more than ten pounds.  Although the surgery was in 1995, she continued to do part time warehouse work through 1999/2000.  When she did warehouse work in 1999 and 2000, she was lifting more than 20 pounds.  She got better and better and tried to work because she had three children and had to go back to work in the warehouse.  After her children grew up, she went back to work.  She does not remember why she stopped working in 1999 – it may have been because it was temporary work at that point and they no longer needed her.  After she was injured in the year 2000, she did very light paperwork in the office for a couple of months, three or fours hours a day – she arranged files and did shredding.  She mostly sat down for the job except to stand for a little while to do shredding.  She would sometimes stand up to walk around when she got a headache.  She took medication for the headaches.  They do not have the file clerk job for her now.  If they did now have that job for her she could do very light work – maybe arranging files and shredding paper.  She is 57.  She last applied for a job in 2005.  She can't stand "like, like on the chair . . .  a lot, maybe two minutes" after which pain starts.  She may have a pinched nerve.  She has problems with

headaches, especially at night.  The headaches last 45 minutes to an hour,

disappear when she takes medicine, but then appear again until she takes medicine

again.  The headaches wake her up so she that she walks around in the middle of

the night.  She feels exhausted in the evening.  She sometimes get confused with

streets and finding addresses.  She sometimes walks around the block and forgets

to shut the stove.  She thinks she has problems with depression.  She has not seen

or been sent to a psychiatrist or psychologist.  She can stand on her feet for 20

minutes and then has to move around.  If she walks for 30 minutes, she needs to lie

down or to stop and sit for 10 minutes before walking again.  She takes Ibuprofen,

Motrin, and Alleve for her headaches during the daytime.  (AR 210-28).

The ALJ summarized plaintiff's testimony as follows:

> At the hearing, the claimant testified that she has a master's degree
> from college in Romania.  She was not able to get a license to teach in
> the U.S.  She worked at warehouse and custodial work until she had
> back surgery in 1995.  After surgery she could not lift more than 10
> pounds.  She did light paper work until that work ran out, and in 1999
> and 2000 did temporary filing work.  She has a pinched nerve now
> and can stand for about 30 minutes.  She walks 20 - 30 minutes for
> exercise.  She has headaches which last 45 minutes and she has upper
> and lower back pain.  She takes Motrin or Tylenol for headaches.  She
> stated she could still do the file clerk work, if offered.

The ALJ then determined that plaintiff's statements concerning "the

intensity, persistence and limiting effects of [her] symptoms [were] not entirely

credible[,]" noting that plaintiff "admitted she could perform light work she did in

the past."  (AR 16).

### 3.    Analysis

As noted above, an ALJ may properly reject the credibility of a claimant

based upon internal contradictions in the claimant's testimony.  Here, the ALJ

21

1  rejected plaintiff's testimony regarding the intensity, persistence and limiting
2  effects of her symptoms because, to the extent such testimony suggested that
3  plaintiff could not arrange files and shred papers (i.e., do the work of a file clerk),
4  it was inconsistent with plaintiff's own testimony that she could or "maybe could"
5  do such light work.  This constitutes a clear and convincing reason to reject
6  plaintiff's testimony.  Although plaintiff correctly notes that the ALJ did not
7  reference every single detail of plaintiff's testimony (e.g., her inability to stand on
8  a chair more than two minutes, her confusion with streets, her need to lie down or
9  sit after walking for 30 minutes), the ALJ was not required to do so.  Plaintiff does
10  not demonstrate that the omitted details of plaintiff's testimony render her unable
11  to perform her past work as a file clerk.  Accordingly, even assuming the ALJ was
12  required to provide more detail than he did, such error was harmless.

13  **V.    CONCLUSION**

14       For the foregoing reasons, the decision of the Commissioner of Social
15  Security is affirmed.

16       LET JUDGMENT BE ENTERED ACCORDINGLY.

17  DATED:   July 7, 2008

18                                   _____/s/_____
19                                   Honorable Jacqueline Chooljian
20                                   UNITED STATES MAGISTRATE JUDGE